[Civ. No. 11415. First Dist., Div. One. Sept. 24, 1941.]

STATE ATHLETIC COMMISSION OF CALIFORNIA et al., Respondents, v. MASSACHUSETTS BONDING AND INSURANCE COMPANY (a Corporation), Appellant.

Charles V. Barfield and John H. Finger for Appellant.

Earl Warren, Attorney General, F. Walter French, Deputy Attorney General, and Robert E. Hatch for Respondents.

KNIGHT, J.—The plaintiffs sued to recover a sum of money claimed to be due from the defendant as surety on a bond. Judgment was given for plaintiffs, and defendant appeals. Defendant does not deny liability on the bond, but contends that the judgment was awarded for an amount in excess of its liability, and that as against the correct amount it was entitled to have credited the sum of $1200 theretofore paid in cash by the principal to the obligee, and since held by the obligee for the purpose for which defendant became surety on the bond. We are of the opinion that both points are well taken.

The events which led up to and brought about the controversy are as follows: Rule 19 of the State Athletic Commission requires that "Every club making application for a professional boxing or wrestling license must furnish a surety bond to the State Athletic Commission for 70 per cent of the capacity of the house. This bond is to guarantee payment of boxers, wrestlers, timekeeper, announcer, club physician and referee, exclusively." And Rule 139 (a) required that "all payment of purses shall be made immediately after the contest or exhibition." Leo Levitt was a promoter of boxing contests, doing business under the name of East Bay Athletic Club; and for several years, in conformity with the requirements of rule 19, kept on file with the commission a bond furnished by defendant in the sum of $4000, which the commission deemed adequate in amount to protect those participating in the ordinary programs put on by the club. On November 9, 1938, Levitt entered into a written contract with a pugilist named Gan (known professionally as "Small Montana") and his manager Sidney Wolfe, whereby Levitt agreed to stage a fight between Gan and another pugilist known as "Little Dado" in Oakland on November 30, 1938, for the "world's flyweight championship." Under the terms of that contract Gan and Wolfe were to receive $2750 and three round trip transportations from New York to San Francisco. At the same time the parties entered into a second written contract calling for a return match between the same pugilists, to be held on March 29, 1939, in which contract Levitt agreed that in the event he did not produce "Little Dado" for that fight he would pay Gan and Wolfe $2500. Shortly prior to the November 30 contest the commission notified Levitt that according to the estimated gross receipts the amount of the bond posted by him was insufficient to protect all ten fighters who were engaged to participate on the program that night, and that consequently he would have to furnish an additional bond or the program would not be allowed to go on. In response to such demand Levitt informed the chairman of the commission and the chief inspector, Shields, that he would not have time to obtain a surety bond, but agreed to deposit cash with the commission in an amount the commission deemed sufficient. In consummation of this agreement Shields went over to Oakland the night of the fight, and about an hour before the

program started Levitt's cashier took $1200 from the box office receipts and handed it to Shields, for which Shields gave a receipt reading: "11/30/39. Rec'd. the sum of Twelve Hundred Dollars to pay fighters from B. Guthertz at 11:30 P. M. D. J. Shields"; but at 11:30 o'clock Levitt told Shields: "We will not pay off either one of the main event fighters tonight." The reason for withholding payment was, as subsequent events showed, that a dispute had arisen as to travelling expenses. However, that night all of the other fighters were paid, and the next morning Levitt paid "Little Dado." On the following day Gan and Wolfe complained to the commission that they had not been paid; whereupon considerable effort was made to straighten out the matter. Shields phoned Levitt, and the latter indicated that he would pay Wolfe if he would come to Oakland. Wolfe went to Oakland, accompanied by Shields, but Levitt refused to pay. The same day the commission demanded that the bonding company pay Gan $1550, which as will be noted was the difference between the amount of Gan's guarantee of $2750 and the $1200 theretofore given by Levitt to Shields to pay the fighters. That same day also Wolfe, accompanied by Shields and a man named Kent, called on the representative of the bonding company and Wolfe stated to him that the commission was willing to pay the $1200 and he inquired when they could get the $1550. However, it appears that Kent claimed to have an assignment from Wolfe; consequently payment by the bonding company was withheld for the purpose of ascertaining to whom the money should be lawfully paid. The result was that Gan and Wolfe were not paid by anyone, and on December 12, 1938, Shields obtained a certified check for the $1200 which he sent to Sacramento, and it was deposited in the "cash trust account" of the commission. Gan and Wolfe then commenced an action against Levitt for the $2750 guarantee for Gan's participation in the November 30, 1938, fight, and on March 13, 1939, judgment was entered in their favor for $2630.32 and interest. The matter of travelling expenses became a disputed issue in the case, which accounts for the lesser amount being awarded.

The return match set for March 29, 1939, failed to materialize; and on May 10, 1939, Gan and Wolfe brought a second action against Levitt for the recovery of the $2500

guarantee agreed to be paid under the second contract; whereupon they levied an attachment on the $1200 held by the commission. Thereafter and on May 15, 1939, the State Athletic Commission joined with Gan and Wolfe in bringing the present action against the bonding company for the recovery of $2630.32, interest and costs, which was the amount of the judgment theretofore awarded in favor of Gan and Wolfe in the action brought against Levitt. By cross-complaint the defendant alleged, among other things, the payment by its principal on the night of the contest to the obligee, the commission, of $1200 for the payment of the fighters, the failure of the obligee to apply said sum to such payment, and the retention of said sum by the commission; and prayed judgment that Gan and Wolfe be decreed to have no rights in or lien upon said $1200 by virtue of said attachment, and that the commission be directed to apply said sum against any liability found to be due from defendant. The relief sought by the cross-complaint was denied, and judgment was awarded in favor of plaintiffs for $2750, interest and costs, which as will be noted was $119.68 in excess of the judgment theretofore recovered by Gan and Wolfe against Levitt.

 As to the first point, it is obvious that since the judgment against Levitt, the principal, was for $2630.32, plus interest, the liability of the surety, exclusive of interest, cannot exceed that amount. ''The obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; and if in its terms it exceeds it, it is reducible in proportion to the principal obligation'' (sec. 2809, Civil Code; *Alexander* v. *Bosworth,* 26 Cal. App. 589, 596 [147 Pac. 607]); and where judgment has been entered against the principal a greater amount may not be recovered from the surety in a subsequent action brought against him (*United States* v. *Allsbury,* 4 Wall. (71 U. S.) 186 [18 L. Ed. 321]; 1 Freeman on Judgments (5th ed.) p. 1026, sec. 466; 21 R. C. L. 1085, 1091; 5 A. L. R. 594, note; 50 Corpus Juris, 93).

 Respondents contend that inasmuch as neither side introduced in evidence the judgment fixing Levitt's liability as principal in the sum of $2630.32, the amount of that judgment was not here legally established; moreover, that at the trial of the present action appellant abandoned the point that as surety it could not be held liable for an amount

greater than that fixed by said judgment. The latter contention is not supported by the record; and as to the former, it was unnecessary to introduce evidence to establish the amount of the Levitt judgment because that fact was admitted by the pleadings. In this respect the record shows that respondents themselves alleged in their complaint that judgment was entered against Levitt for $2630.32, interest and costs; they also alleged the date of the judgment, the title of the court and cause, and the number of the action in which the judgment was rendered; and there was no direct denial of those allegations in the answer. The denial was general and based on information and belief; and it is well settled that facts which are of public record must be deemed admitted by failure directly to deny the same; that a denial thereof based on information and belief raises no issue. (*Santa Barbara Lumber Co.* v. *Ross,* 183 Cal. 657 [192 Pac. 436]; *Mulcahy* v. *Buckley,* 100 Cal. 484 [35 Pac. 144]; *Marxen* v. *Herron,* 129 Cal. App. 479 [18 Pac. (2d) 1002]; 21 Cal. Jur. 150.) Furthermore, it is nowhere claimed by any of the parties that the judgment against Levitt was rendered for any different amount. On the morning of trial the complaint was amended in certain particulars, but the allegations above mentioned were not affected thereby.

██ As to the issue of the $1200, the undisputed evidence shows that at Levitt's request and with the approval of the commission the inspector took from the box office $1200 for the express purpose of paying the fighters that night. The receipt given by Shields for the money plainly so stated. It was cash that the promoter would have used to pay the fighters that night; and Shields would have used it that night to pay Gan for his participation in the fight if a dispute had not arisen. Under well settled legal principles, therefore, the defendant surety company is entitled to have this cash applied in reduction of its liability on the bond. As shown, the deposit was made with funds of the principal; as between the principal and surety the principal is primarily liable; and the surety who is called upon to pay the debt of his principal may seek reimbursement. Section 2845, Civil Code, provides: "A surety may require his creditor to proceed against the principal, or to pursue any other remedy in his power which the surety can not himself pursue, and which would lighten his burden; and if in such case the

creditor neglects to do so, the surety is exonerated to the extent to which he is thereby prejudiced''; furthermore, section 2850 of the same code declares: ''Whenever property of a surety is hypothecated with property of the principal, the surety is entitled to have the property of the principal first applied to the discharge of the obligation.'' And section 2849 of the Civil Code provides: ''A surety is entitled to the benefit of every security for the performance of the principal obligation held by the creditor, or by a co-surety at the time of entering into the contract of suretyship, or acquired by him afterwards, whether the surety was aware of the security or not.'' (See 37 A. L. R. 1262, note, right of surety or his privies to require creditor to resort to security given by principal before enforcing security given by surety.) These code sections are the enactment of rules developed in equity to give relief from the common law doctrine which permitted the creditor to enforce remedies against the surety without reference to his rights against the principal. (See 21 R. C. L. 1124–1128; 50 C. J. 230–235; 23 Cal. Jur. 1071.) In the present case the surety gave its personal obligation in the form of a bond and the principal delivered to the commission as the obligee of the bond a sum of money to be applied to the specific purpose for which the bond was given. The surety filed a cross-complaint in which the commission, Gan, Wolfe, and M. H. Myers & Co. (assignee of Gan and Wolfe, and substituted as plaintiff for them), were made cross-defendants. In said cross-complaint all of the facts relating to the transaction and particularly those pertaining to the payment to the commission of the $1200 were appropriately alleged; and part of the relief prayed for was ''that cross-defendant, State Athletic Commission, be required and directed to pay and apply said sum of Twelve Hundred Dollars ($1200.00) and interest thereon in *pro tanto* exoneration of the liability of this cross-complainant upon its said bond. . . . '' There is no sufficient reason, therefore, why, in the present action, the commission may not be required to apply the $1200 so taken by it to the specific purpose for which it was taken, namely, the payment of the fighters; and thus reduce the monetary liability of the surety upon which the commission is now suing.

830

Respondents contend that the $1200 was taken and should be treated only as collateral security for the $4000 bond, and therefore can be resorted to only in the event the $4000 bond proves to be insufficient. But the undisputed facts show that such was not the purpose of the payment or acceptance of the money. As shown by the receipt given by Shields and by his testimony at the trial, it was delivered to and accepted by him for the purpose of paying the fighters therewith; moreover, the transactions which took place afterwards, in attempting to straighten out the matter, show beyond question that all of the parties, including the commission, understood that the money was being held by the commission for that specific purpose. Therefore under the legal principles above set forth the surety is entitled to have the money applied to the purpose for which it was paid and accepted.

■ Nor do we find any merit in respondents' contention that Gan and Wolfe acquired paramount rights to the $1200 by virtue of the levy of attachment, for the reason that at the time of the levy it was not Levitt's money. As already pointed out, Levitt paid the money to and it was accepted by Shields as the duly authorized representative of the commission, for the express purpose of paying the fighters therewith that night for the services rendered by them on that particular program. If it had not been so paid, the commission would not have allowed the show to open. The moment the money was paid to and accepted by Shields, it became trust money to be used for a specific purpose, and hence not subject to garnishment. (*Van Orden* v. *Anderson*, 122 Cal. App. 132 [9 Pac. (2d) 572].) Stated another way, since the money was taken officially by the commission for the definite purpose of paying the fighters on that particular program, one of whom was Gan, the law will not permit him to defeat the rights of the surety to have the money applied to that purpose by attaching it for breach of contract for failure to hold the second contest.

Respondents' assertion that Levitt exercised control over the money after it was delivered to Shields is not supported by the record. All that Levitt said to Shields that night was, ''We will not pay off either one of the main event fighters tonight,'' but he made no reference whatever to the $1200.

The appeal is now before the court on rehearing, which was

granted on petition of respondents in order to give consideration to a contention made therein that the $1200 was subject to the claims of other persons not parties to this action. In this connection it was stated that "prior to the trial" of the present action "Levitt was adjudicated a bankrupt"; that "This appears during the cross-examination of Levitt"; and that "his trustee in bankruptcy lays claim to the return of this $1200." An examination of the record proves, however, that there is nothing whatever in the pleadings or the evidence to substantiate respondents' statement. In fact respondents now concede that Levitt was not adjudged a bankrupt until February 28, 1940, which is more than four months subsequent to the trial of the present action and more than three months after the entry of the judgment. Even though it be assumed, as respondents say (although there is nothing whatever in the record so showing), that subsequent to the bankruptcy adjudication in February, 1940, the trustee did lay claim to the $1200, which admittedly was paid to the commission on the night of November 30, 1938, the situation herein is not altered for the simple reason that after Levitt delivered the money to the commission for the specific purpose of paying the fighters therewith, it was no longer Levitt's property. The other persons referred to by respondents as claimants to the money are the other participants of the November 30, 1938, program. But respondents have evidently overlooked not only the positive, uncontradicted testimony given by the commission's chief inspector, Shields, that all others had been paid and that he held receipts from them, but also the affirmative finding of the trial court that "on or before Dec. 1, 1938, all boxers participating in said boxing show of Nov. 30, 1938, were fully paid by said Levitt, except the said Gan and Wolfe."

In accordance with the views above expressed it is ordered that the judgment appealed from be and the same is hereby reversed; and that a new judgment be entered directing the commission to pay the $1200 now held by it to M. H. Myers & Co., as assignee of Gan and Wolfe; and that respondents do have and recover of and from the appellant bonding company the difference between the amount of the judgment rendered against Levitt, to-wit, the sum of $2630.32, and the sum of $1200, with interest on the net amount from November 30,

832

1938, and costs of suit. Appellant will recover costs of appeal.

Peters, P. J., and Ward, J., concurred.