[No. A018013. First Dist., Div. One. Apr. 23, 1987.]

ITT DIVERSIFIED CREDIT CORPORATION, Plaintiff and Appellant,
v.
HIGHLANDS INSURANCE COMPANY OF HOUSTON, TEXAS,
Defendant and Appellant.

**COUNSEL**

Bernard S. Greenfield, Mark K. Oto, Sblend A. Sblendorio and Levy, Greenfield & Davidoff for Plaintiff and Appellant.

Leonard J. Martinet, Zenobia Lal-Wadia, Jill A. Jacobs and Williams & Martinet for Defendant and Appellant.

**OPINION**

NEWSOM, J.—ITT Diversified Credit Corporation (hereafter respondent or ITT) provided funding for the purchase of 64 motorcycles by Transam Motor Sports, Inc. (hereafter Transam) in accordance with the terms of an

"Agreement for Wholesale Financing" (hereafter the agreement) executed by the parties in February of 1978.[1] The total amount of money advanced to Transam by respondent pursuant to the agreement was $71,425.30.

In July of 1978, respondent filed a complaint against Transam and others[2] alleging that 13 of the financed motorcycles had been "sold or otherwise disposed of by TRANSAM from its retail outlet" without payment to ITT in the amount of $16,887.70 as required by the agreement. In addition, eight of the sixty-four motorcycles, having a value of $11,507.80, had been reported by Transam as lost or stolen, also without the required repayment to respondent. According to the complaint, Transam further failed to pay $41,079.20 owing to respondent for the remaining 43 motorcycles pursuant to the agreement, although a lawful "demand therefor" had been made. By the complaint, respondent sought return of the motorcycles or a money judgment representing the value of the withheld property and money.

The trial court subsequently issued a writ of possession in favor of respondent for the 43 motorcycles retained by Transam. To permit Transam to retain possession of those motorcycles, appellant issued a written undertaking in the amount of $41,079.20 as surety for a redelivery bond (Code Civ. Proc., § 515.020). It is undisputed that neither the motorcycles nor the $41,079.20 were thereafter returned to respondent. And appellant does not dispute the fact that as surety it guaranteed restoration of the motorcycles or their value to respondent.

On April 14, 1981, the date the parties were to go to trial on the underlying action, a settlement conference was held at which a stipulated judgment was reached by respondent and Transam. Appellant was not involved in the underlying action and did not give its consent to the stipulated judgment.

The pertinent terms of the stipulated judgment are as follows: Transam admitted indebtedness to respondent in the amount of $41,079.20, representing the monetary value of the 43 "motorcycles for which claim and delivery was sought," as well as an additional $44,170.90 for "other contractual obligations" arising out of the agreement, for a total of $85,250.10. Judgment was to be entered "in favor of ITT and against TRANSAM" in the amount of $85,250.10. Transam was ordered to pay $20,000 to respondent in two installments of $10,000, the first due by July 15, 1981, and the second due by September 15, 1981. In the event Transam made the two installment

---

[1] ITT has also filed an appeal in this action, but for the sake of clarity will be referred to as respondent.

[2] The defendants other than Transam were Leonard and Mildred Hesterman and the McTavish Corporation, guarantors of the amount owed from Transam to respondent under the agreement. All defendants occupy the same position in this action, and will be referred to herein simply as Transam.

payments as ordered, its obligation to respondent would be extinguished on the condition that respondent also recovered the full amount of the redelivery undertaking—$41,079.20—from appellant as surety. If Transam failed to make the ordered installment payments, the judgment would "remain the sum of $85,250.10, subject to being reduced by any amounts collected from the surety on the redelivery undertaking, . . . ."

Respondent received the first installment payment on July 15, 1981, but no further payment was made by Transam. Thereafter, respondent proceeded against appellant by way of a motion to enforce the judgment. After a hearing, appellant was found liable to respondent in the sum of $31,079.20, representing the amount of the redelivery bond less the $10,000 installment payment made by Transam in accordance with the stipulated judgment.

Appellant claims that it was exonerated from any financial responsibility to respondent by the stipulated judgment and operation of law. In its appeal, ITT argues that appellant's obligation as surety should not have been reduced by $10,000.

█ Appellant argues that it was discharged from liability by the stipulated judgment, which materially altered the terms of the debtor's underlying obligation. Appellant relies for this proposition on Civil Code section 2819, which provides: "A surety is exonerated, except so far as he may be indemnified by the principal, if by any act of the creditor, without the consent of the surety the original obligation of the principal is altered in any respect, or the remedies or rights of the creditor against the principal, in respect thereto, in any way impaired or suspended." It is appellant's contention that by extending the time within which Transam had to pay the amount due respondent, the stipulated judgment constituted an impairment or suspension of the original obligation within the meaning of Civil Code section 2819.

█ One of the recognized defenses of a surety arises under Civil Code section 2819 where the principal obligation is materially altered without the knowledge or consent of the surety. (*V.I.P. Agency of No. Cal., Inc.* v. *Duffy Electronics, Inc.* (1979) 92 Cal.App.3d 849, 852 [155 Cal.Rptr. 45] (hereafter *V.I.P.*); *Coutin* v. *Nessanbaum* (1971) 17 Cal.App.3d 156, 162 [94 Cal.Rptr. 453].) The theory underlying the rule is that a surety "cannot be held beyond the express terms of his contract . . . ." (*U.S. Leasing Corp.* v. *duPont* (1968) 69 Cal.2d 275, 289 [70 Cal.Rptr. 393, 444 P.2d 65].)

It has often been held that any extension of the time within which the debtor must pay impairs or suspends the rights of the creditor and thus exonerates the surety from liability. (*Wexler* v. *McLucas* (1975) 48 Cal.App.3d

Supp. 9, 14 [121 Cal.Rtpr. 453]; *Westinghouse Credit Corp.* v. *Wolfer* (1970) 10 Cal.App.3d 63, 68 [88 Cal.Rptr. 654]; *Brock* v. *Western Nat. Indem. Co.* (1955) 132 Cal.App.2d 10, 16 [281 P.2d 571].) As the court in *Wise* v. *Clapper* (1968) 257 Cal.App.2d 770, 774 [65 Cal.Rptr. 231], observed: "[A]n extension of time of payment without the consent of the surety constitutes a material alteration of the original obligation and discharges the surety. [Citations.] Injury to the surety is presumed as a matter of law and, hence, it is not a matter which the creditor may inquire into. [Citations.]" And in *Mortgage Finance Corp.* v. *Howard* (1962) 210 Cal.App.2d 569, 572 [26 Cal.Rptr. 917], the court explained: "[A]n extension of time by the creditor to the principal constitutes a material change in the parties' status. . . . '[T]he surety is entitled to stand on the strict letter of the contract upon which he is liable and . . . any change therein made without his consent, by which the contract is altered so as to impair or suspend the right of the creditor to proceed to enforce payment, fully releases the surety. . . .' 'We are not required and under the law not permitted to speculate whether the alteration benefits or injures the guarantor. It is enough that it is a material alteration of the terms of the guaranty. [Citations.]' "

At the time respondent filed its action to recover from Transam under the original agreement, Transam was already in default. In fact, respondent obtained a writ of possession, and only by virtue of the undertaking issued by appellant was Transam able to retain the motorcycles at issue. ▮ It is undisputed that the stipulated judgment extended the time for performance by Transam. Deferred installment payments were permitted in July and September of 1981 to satisfy the debtor's obligations which were already past due under the agreement.[3] Hence, Transam was certainly placed in a more favorable position by the extension of time for payment. The determinative factor, however, is the effect of the stipulated judgment upon *appellant.* (*Mortgage Finance Corp.* v. *Howard, supra,* 210 Cal.App.2d 569, 572.)

Appellant insists that the case before us is governed by *V.I.P., supra,* 92 Cal.App.3d 849, where the surety presented an undertaking (Code Civ. Proc., § 489.310) to release a writ of attachment obtained by the creditor following initiation of suit against the principal. Subsequently, the creditor and principal entered into a stipulation reducing the amount of the original obligation "on the condition that execution [of judgment] be stayed pending payment of the judgment in installments: . . ." (*Id.* at p. 852.) After the principal failed to make payments as specified in the stipulated judgment, the

---

[3]The stipulated judgment also effectuated a reduction in the amount of Transam's obligation to respondent, but such modification was not a material alteration within the meaning of Civil Code section 2819. (*V.I.P., supra,* 92 Cal.App.3d 849, 852; *Wise* v. *Clapper, supra,* 257 Cal.App.2d 770, 774.)

creditor sought recovery from the surety. Relying on Civil Code section 2819, the surety claimed that the attachment bond had been exonerated. This court agreed, concluding that the stipulated judgment, "transforming an immediate obligation to pay into an obligation that was enforceable only according to a schedule of deferred payments, was a substantial alteration of 'the original obligation of the principal.' It also altered 'the remedies or rights of the creditor against the principal. . . .' [The surety] did not consent to the alteration; therefore [the surety's] obligation as surety was exonerated." (*Id.* at p. 853.) The court explained: "The extension of time for payment postponed and perhaps depreciated the value of the surety's remedy of seeking recovery out of the assets of the principal upon being required to satisfy the debt." (*Ibid.*; see also *Montgomery* v. *Ottoman* (1928) 88 Cal.App. 755, 758-760 [264 P. 283].)

Respondent seeks to avoid operation of Civil Code section 2819 and the holding of *V.I.P.* by arguing that appellant became liable as a surety upon Transam's default, before entry of the stipulated judgment. Therefore, reasons respondent, at that time appellant became "absolutely obligated" to pay Transam's debt and any modification in the underlying obligation by the stipulated judgment was "irrelevant."

According to established law, the liability of a surety accrues immediately upon default of the principal. (Civ. Code, § 2807; *Glickman* v. *Collins* (1975) 13 Cal.3d 852, 862 [120 Cal.Rptr. 76, 533 P.2d 204, 93 A.L.R.3d 513]; *State Bd. of Equalization* v. *Balboa Ins. Co.* (1978) 89 Cal.App.3d 499, 504 [155 Cal.Rptr. 205].) In *Impac Imported Parts & Accessories Corp.* v. *Rattray* (1979) 95 Cal.App.3d 792 [157 Cal.Rptr. 226] (hereafter *Impac*), relied upon by respondent, the court employed this rule to conclude that a surety on a $20,000 promissory note had not been exonerated under Civil Code section 2819 by a "stipulation for judgment" which permitted the principal, already in default, to make installment payments of $5,000 per month. The court observed that upon default the principal and surety became "jointly and severally liable on the promissory note by reason of section 2807 of the Civil Code . . . ."[4] (*Id.* at p. 796.) According to the court, the subsequent "stipulation for judgment" merged "the claim in the judgment . . . . As a consequence, the arrangements made for installment payments and otherwise were made with reference to a new obligation of the principal only and did not in any way operate to modify the terms of the promissory note. Moreover, because of the operation of section 2807, [the surety] remained independently liable on the note, regardless of the entry of judgment against . . . its principal." (*Id.* at p. 797.)

---

[4]Civil Code section 2807 provides that "[a] surety who has assumed liability for payment or performance is liable to the creditor immediately upon the default of the principal, and without demand or notice."

*Impac* conflicts with *V.I.P., supra,* 92 Cal.App.3d 849, and *Montgomery* v. *Ottoman, supra,* 88 Cal.App. 755, both of which held that a stipulated judgment which extends time for payment materially alters the obligation of the principal and thus exonerates the surety. (See also *Westinghouse Credit Corp.* v. *Wolfer, supra,* 10 Cal.App.3d 63, 67-68.) In *V.I.P.,* "no significance" was found in the fact that the extension was "specified in the stipulated judgment itself" rather than agreed upon "before the case was tried." (92 Cal.App.3d at p. 853.) And in *Montgomery,* the court, perceiving that Civil Code section 2819 " 'speaks with absolute finality upon the subject' " (*id.* at p. 759), declared: "[T]he cases cited and the statute specifically covering the point unequivocally state that the injury is beside the point. The stipulation extended the time of payment of the indebtedness; authorized entry of judgment in a manner not contemplated by the sureties and not included within the terms of the undertaking entered into by them, to wit: upon failure of installment payments . . . and absolutely suspended proceedings in the case until default was made in the performance of the stipulation. This stipulation was filed in court, was breached and judgment entered, not on the original obligation, but, . . . in conformity to the stipulation. The attempt in the stipulation to forestall the release of the sureties by agreement between the parties without consultation with the sureties was of course abortive." (*Id.* at p. 760.)

We are not persuaded that our inquiry ends with the finding that the principal's default preceded the stipulated judgment. Neither, we conclude, is it sufficient to simply find that an extension of time, however and whenever granted, has altered the original obligation. Rather, the proper approach is to determine whether that judgment materially modified the original obligation in a manner not contemplated by the surety. Taking as a starting point the settled principle that "a surety cannot be held beyond express terms of his contract," (*Southern Cal. First Nat. Bank* v. *Olsen* (1974) 41 Cal.App.3d 234, 241 [116 Cal.Rptr. 4]) we must, in order to ascertain the nature and extent of liability to which appellant bound itself, examine both the undertaking and the underlying agreement the performance of which appellant has, as surety, guaranteed. (*U.S. Leasing Corp.* v. *duPont, supra,* 69 Cal.2d 275, 285.) The scope of appellant's obligation is measured by the underlying agreement considered in conjunction with the redelivery bond. (*City of Sacramento* v. *Trans Pacific Industries, Inc.* (1979) 98 Cal.App.3d 389, 400-401 [159 Cal.Rptr. 514].) Our task is to discern, from the language of those documents, the mutual intent of the parties. (*American City Bank* v. *Tourtelot* (1978) 86 Cal.App.3d 585, 591 [150 Cal.Rptr. 361].)

The court in *Impac* implicitly recognized the more complex nature of the requisite inquiry by conceding that *V.I.P.* and *Montgomery* "were correctly decided" but "inapposite because there was actually an alteration of the obli-

gations therein guaranteed whereas there was no such alteration in the current case." (*Impac, supra,* 95 Cal.App.3d 792, 799.) The court noted that a surety who files a bond to release an attachment "undertakes to guarantee the payment of any judgment entered against the defendant according to the allegations of the complaint as of the time the bond is filed. As a consequence, any dealing between the plaintiff creditor and the defendant principal which alters ... the remedies of the plaintiff creditor against the defendant principal, e.g., deferring execution, clearly operates to exonerate the surety under section 2819 and the holding of the *V.I.P.* case." (*Ibid.*) The case of a surety on a bond to release attachment was contrasted with that of guarantor of promissory note, the court stating: "At all times, the note obligation which defendant had guaranteed and for which he had become independently liable under section 2807, remained, vis-à-vis the surety, just as it had from the beginning. The stipulation which plaintiff and the principal entered into was not with an eye to altering the terms of the note but to implementing a remedy which the plaintiff at all times was at liberty to pursue against the principal after default." (*Ibid.*)

We adopt the more pragmatic and flexible approach taken by the court in *Impac.* All pertinent factors must be considered to determine whether some material unforeseen obligation has been foisted upon the surety.

Respondent asks us to "apply the standards used in the promissory notes cases, *Impac* and *Ramish,* since a bond or guaranty securing a note closely parallels the purpose of a redelivery bond." ▪ In one respect, an attachment release bond is much like the redelivery bond at issue: in each, the limits of the surety's guarantee are defined by the complaint rather than the preexisting obligation—for example, a promissory note. An important distinction must also be recognized, however: an attachment release bond obligates the surety to pay any judgment entered against the principal "according to the allegations of the complaint as of the time the bond is filed." (*Impac, supra,* 95 Cal.App.3d 792, 799.) An undertaking such as that executed by appellant (Code Civ. Proc., § 515.020) provides for redelivery of specific property which is the subject of the writ of possession.

We find this distinction critical here. As respondent alleged in the complaint, the principal's obligation encompassed more than the 43 motorcycles in Transam's possession. Transam was indebted to respondent for additional sums under the agreement. The stipulated judgment took cognizance of this additional obligation by declaring that the total amount due from Transam to appellant was $85,250.10: $41,079.20 for the 43 motorcycles retained by Transam (and the amount of appellant's undertaking), and "other contractual obligations" arising out of the agreement in the amount of $44,170.90.

Installment payments were permitted in the amount of $20,000, but the amount of the judgment against Transam included the remaining $41,079.20 in the event respondent was unable to collect from appellant as surety. **(1c)** Thus, the obvious intent and effect of the stipulated judgment was to extend Transam's time to pay amounts *other than* that guaranteed by appellant's redelivery bond. The obligation which was the subject of the redelivery bond remained essentially unaltered by the stipulated judgment. Hence, the creditor and principal did not materially alter the original obligation as it related to appellant. We accordingly conclude that appellant was not exonerated from liability under Civil Code section 2819. (*U.S. Leasing Corp.* v. *duPont, supra,* 69 Cal.2d 275, 289; *Impac, supra,* 95 Cal.App.3d 792, 799-800; *Rio Grande Oil Co.* v. *Seaboard Surety Corp.* (1934) 139 Cal.App. 164, 172-174 [33 P.2d 887].)

▮ Appellant also argues that it has been exonerated by respondent's failure to include in the stipulated judgment an assertion of impossibility of return of the motorcycles. Appellant submits that a creditor in a replevin action must obtain a judgment declaring that return of the property is impossible before its value may be recovered. We disagree.

Appellant has misperceived the state of the law. In *DeLuca* v. *Budke* (1956) 138 Cal.App.2d 565, 567 [292 P.2d 298], relied upon by appellant, the court stated that a surety is discharged if a creditor "fails to obtain judgment *either* for the value of the property or for its possession, . . . ." (Italics added.) As the court observed in *Morton Regent Enterprises, Inc.* v. *Leadtec California, Inc.* (1977) 74 Cal.App.3d 842, 846 [141 Cal.Rptr. 706]: "In the case of claim and delivery the surety is liable for judgment which orders return of the property under the bond or a judgment for its value." (See also *Law* v. *Heiniger* (1955) 132 Cal.App.2d Supp. 898, 902 [282 P.2d 607].)

It has been held that the value of withheld property is recoverable only as an alternative when redelivery is unavailable as a remedy. (*Riverside Portland Cement Co.* v. *Taft* (1923) 192 Cal. 643, 649 [221 P. 357].) But a money judgment in lieu of the property is entirely proper. (*Amer. Aero. Corp.* v. *Grand Cen. Aircraft Co.* (1957) 155 Cal.App.2d 69, 84 [317 P.2d 694].) A provision in a judgment for recovery of money as an alternative to the property is for the benefit of the creditor. (*Law* v. *Heiniger, supra,* 132 Cal.App.2d 898, 903.)

Hence, while the ordinary form of judgment in a claim and delivery action requires return of the property or payment of its value in the event the property cannot be recovered, "where it appears that a delivery of the property cannot be had the judgment need not be in the alternative, but may properly be for its value alone." (*Donovan* v. *Aetna Indemnity Co.* (1909) 10

Cal.App. 723, 728 [103 P. 365].) A special finding that redelivery of the property is unavailable need not be made; " '[a]n absolute judgment for the money is equivalent to such a finding.' " (*Ibid.*)

In its pleading, respondent sought return of the motorcycles in Transam's possession. The stipulated judgment declares that Transam failed to return the motorcycles to respondent and, as of the date of judgment, "no longer had, nor do they now have, possession, custody or control of any of said motorcycles." We could presume that the evidence established Transam's inability to return the motorcycles (cf. *Benson* v. *Olender* (1926) 77 Cal.App. 287, 289 [246 P. 345]), but we need not do so. The recital in the stipulated judgment specifically states that the remedy of redelivery is unavailable. Accordingly, the judgment for the value of the property was proper. (*Riverside Portland Cement Co.* v. *Taft, supra,* 192 Cal. 643, 649; *Donovan* v. *Aetna Indemnity Co., supra,* 10 Cal.App. 723, 728.)

■ Appellant's final contention is that the obligation of $41,079.20 must be reduced to $20,000, the amount declared by the stipulated judgment to be owed to respondent by the principal. In making this contention, appellant relies on the rule, found in Civil Code section 2809,[5] that the liability of the surety cannot exceed that of the principal. (*Pacific Employers Ins. Co.* v. *City of Berkeley* (1984) 158 Cal.App.3d 145, 156 [204 Cal.Rptr. 387]; *County of Los Angeles* v. *Wilshire Ins. Co.* (1975) 44 Cal.App.3d 952, 956.) "Thus, the obligation of ... a surety is identical to that of the principal debtor." (*Brunswick Corp.* v. *Hays* (1971) 16 Cal.App.3d 134, 137 [93 Cal.Rptr. 635].) "[A]nd where judgment has been entered against the principal a greater amount may not be recovered from the surety in a subsequent action brought against him [citations]." (*State Ath. Com.* v. *Mass. Bonding etc. Co.* (1941) 46 Cal.App.2d 823, 827 [117 P.2d 75].)

We find that the trial court did not impose upon appellant a liability greater than that of its principal or exceeding the scope of the suretyship agreement. By the terms of the stipulated judgment, the principal was not only ordered to pay respondent $20,000, but also remained liable to respondent for an additional $41,079.20, the amount of the undertaking issued by appellant. A surety's liability is measured by the language of the contract creating it when read in light of the circumstances attending the transaction. (*Ryan* v. *Shannahan* (1930) 209 Cal. 98, 101 [285 P. 1045].) According to its undertaking, appellant became jointly and severally liable with Transam to respondent in an amount up to $41,079.20. That liability was not limited,

---

[5]Civil Code section 2809 provides, in pertinent part: "The obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; ...." (*Michel & Pfeffer* v. *Oceanside Properties, Inc.* (1976) 61 Cal.App.3d 433, 441 [132 Cal.Rptr 179].)

as to either the principal or surety, by the terms of the stipulated judgment, and so appellant's obligation to respondent has not been reduced to $20,000. (*Heckes* v. *Sapp* (1964) 229 Cal.App.2d 549 555 [40 Cal.Rptr. 485].)

■ In its appeal, respondent argues that the trial court erred by "lowering appellant's liability to $31,079.20 because of TRANSAM's $10,000.00 payment to ITT, . . . ." We agree.

The $10,000 payment made to respondent by Transam in accordance with the terms of the stipulated judgment was for obligations on the underlying agreement separate and distinct from the redelivery bond issued by appellant. The record shows that Transam had contractual obligations to respondent in the aggregate amount of $85,250.10, as stated in the stipulated judgment. To satisfy that total obligation, Transam could make two payments of $10,000 to respondent, provided respondent was able to recover the full amount of the redelivery bond, $41,079.20, from appellant. But, as the stipulated judgment also provided, Transam remained liable to respondent for the additional sum of $41,079.20 "[i]n the event . . . ITT is unsuccessful in collecting monies from the surety, . . . ."

It is apparent that Transam's payment of $10,000 to respondent was not intended to reduce the separate indebtedness covered by the redelivery bond. Hence, appellant's obligation to respondent as surety remains $41,079.20. The trial court erred by entering judgment for respondent for $10,000 less than the amount of the undertaking.

The judgment is modified to award respondent damages in the amount of $41,079.20. In all other respects the judgment is affirmed. Respondent is awarded costs on appeal.

Racanelli, P. J., and Holmdahl, J., concurred.

A petition for a rehearing was denied May 26, 1987, and the petition of defendant and appellant for review by the Supreme Court was denied July 15, 1987.